IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANALOG DEVICES, INC. and HITTITE
MICROWAVE LLC,

        Plaintiffs,

        v.

MACOM TECHNOLOGY SOLUTIONS
HOLDINGS, INC. and MACOM
TECHNOLOGY SOLUTIONS INC.,

        Defendants.

Civil Action No. 1:18-cv-11028-GAO

██████████████

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
ANALOG'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.    BACKGROUND / STATEMENT OF RELEVANT FACTS ...................................... 2

    A.   The '752 Patented Invention, and Analog's HMC998 Amplifier.................................... 2

    B.   Frank Traut's Move to MACOM................................................................. 5

    C.   MACOM's Attempt to Capitalize on Analog Trade Secrets ............................ 6

III.   LEGAL STANDARDS .............................................................................................. 8

IV.   ARGUMENT ............................................................................................................... 9

    A.   Analog is Likely to Succeed on the Merits.................................................. 10

         1.   MACOM's MAAP-011247 Amplifier Infringes the '752 Patent ......................... 10

         2.   The '752 Patent is Likely to Withstand Validity Challenges ................................ 12

         3.   Analog Is Likely to Succeed in Proving Trade Secret Misappropriation.............. 13

              a.   Analog's Design Choices and Customer Needs are Trade Secrets................. 13

              b.   Analog Took Reasonable Steps to Protect the Confidentiality of its Trade Secrets ................................................................................................. 14

              c.   MACOM Improperly Acquired Analog's Trade Secrets.............................. 15

         4.   This Court Should Allow Limited Expedited Discovery Concerning MACOM's Trade Secret Misappropriation ............................................................... 16

    B.   Analog Will Suffer Irreparable Harm If MACOM Is Allowed to Make Additional Sales of the MAAP-011247 Amplifier Before Trial...................................... 16

    C.   The Balance of Hardships Strongly Favors a Preliminary Injunction ........................ 19

    D.   The Public Interest Strongly Favors a Preliminary Injunction ..................................... 20

V.    CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abbott Labs. v. Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008)................................................................8, 10, 18

*Astrazeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010).........................................................................8

*Bio–Technology Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996)..........................................................................18

*Bio-Imaging Techs., Inc. v. Marchant*,
584 F. Supp. 2d 322 (D. Mass. 2008) ..............................................................17

*Biogen Idec MA Inc. v. Trustees of Columbia Univ. in City of New York*,
332 F. Supp. 2d 286 (D. Mass. 2004) ............................................................8, 9

*Boston Sci. Corp. v. Lee*,
No. 13-13156-DJC, 2014 WL 1946687 (D. Mass. May 14, 2014) ...................15

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008)..........................................................................20

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012)..........................................................................19

*Curtiss–Wright Corp. v. Edel–Brown Tool & Die Co.*,
381 Mass. 1 (1980) ...........................................................................................15

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
795 F. Supp. 501 (D. Mass. 1992) .................................................................9, 15

*E. Marble Prods. Corp. v. Roman Marble, Inc.*,
372 Mass. 835 (1977) .......................................................................................15

*EchoMail, Inc. v. Am. Express Co.*,
378 F. Supp. 2d 1 (D. Mass. 2005) ..................................................................17

*Edwards v. Athena Capital Advisors, Inc.*,
No. 072418E, 2007 WL 2840360 (Mass. Super. Ct. Aug. 9, 2007)..................20

*EEOC v. Astra USA, Inc.*,
94 F.3d 738 (1st Cir. 1996)................................................................................9

*Garvin GuyButler Corp. v. Cowen & Co.*,
    588 N.Y.S.2d 56 (Sup. Ct. 1992) ........................................................15

*Gen. Elec. Co. v. Sung*,
    843 F. Supp. 776 (D. Mass. 1994) .......................................................20

*Glosband v. Watts Detective Agency, Inc.*,
    21 B.R. 963 (D. Mass. 1981) ...............................................................14

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988)........................................................8, 18

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .............................................................19

*In re Yankee Milk, Inc.*,
    372 Mass. 353 (1977) ..........................................................................14

*J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*,
    357 Mass. 728, 260 N.E.2d 723 (1970) ...............................................13

*Jet Spray Cooler, Inc. v. Crampton*,
    361 Mass. 835 (1972) .....................................................................16, 20

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974).............................................................................20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey*,
    18 Mass. L. Rpt. 49 (Mass. Super Ct. 2004)........................................17

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011) ...........................................................................8

*Optos, Inc. v. Topcon Med. Sys., Inc.*,
    777 F. Supp. 2d 217 (D. Mass. 2011) ......................................... passim

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996).........................................................18, 19

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012)............................................................19

*Printguard, Inc. v. Anti-Marking Sys., Inc.*,
    535 F. Supp. 2d 189 (D. Mass. 2008) ....................................................8

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
    237 F.3d 1359 (Fed. Cir. 2001)............................................................19

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) .................................................................20

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ..............................................................19

*Salomon Smith Barney, Inc. v. Barcomb*,
    No. 02-J-692, 2003 Mass. App. LEXIS 1497 (Mass. App. Ct. Jan. 3, 2003) .........................14

*Sanofi–Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ..............................................................18, 20

*Shipley Co., Inc. v. Clark*,
    728 F. Supp. 818 (D. Mass 1990) ...........................................................17

*Spruce Envt'l Techs., Inc. v. Festa Radon Techs., Co.*,
    No. 15-11521, 2015 U.S. Dist. LEXIS 86552 (D. Mass. July 2, 2015) ....................................9

*Stone Legal Res. Grp., Inc. v. Glebus*,
    No. 02-5136, 2002 Mass. Super. LEXIS 555 (Mass. Super. Ct. Dec. 17, 2002) ....................15

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009) ...............................................................8, 9, 12

*TouchPoint Sols., Inc. v. Eastman Kodak Co.*,
    345 F. Supp. 2d 23 (D. Mass. 2004) .........................................................14, 19

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
    699 F.3d 1340 (Fed. Cir. 2012) ..............................................................12

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
    748 F.3d 1159 (Fed. Cir. 2014) ..............................................................18, 19

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..............................................................10

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) .................................................................9

*Whipps, Inc. v. Ross Valve Mfg. Co.*,
    No. 14-40045-TSH, 2014 WL 1874754 (D. Mass. May 8, 2014) ..........................................15

*Witkop & Holmes Co. v. Great Atl. & Pac. Tea Co.*,
    124 N.Y.S. 956 (Sup. Ct. 1910) .............................................................16

## STATUTES

35 U.S.C. § 102 ............................................................................12

35 U.S.C. § 103 .................................................................................................................. 12

35 U.S.C. § 282 .............................................................................................................. 8, 12

Mass. Gen. Laws ch. 93, § 42 .......................................................................................... 14

Mass. Gen. Laws ch. 266, § 30 ........................................................................................ 14

## I.      INTRODUCTION

Beginning in 2015, three senior Analog[1] employees left Analog to join its competitor, MACOM.  Since their arrival at MACOM, MACOM has introduced several products, including gallium arsenide ("GaAs") wideband power amplifiers, in direct competition with (indeed, in some instances "pin-compatible" to) Analog's products.  These MACOM products could not have made it to the market so quickly or been so successful, without MACOM using Analog's trade secrets and infringing Analog's patent rights.

By this motion, Analog requests an order preventing further attack on Analog's market share for these power amplifiers.  Specifically, Analog seeks a preliminary injunction barring further sale and marketing of MACOM's MAAP-011247 and MAAP-011247-DIE amplifiers (collectively, the "MAAP-011247 amplifier").  By separate motion filed this same day, Analog also seeks expedited discovery to determine the extent of MACOM's use of Analog's technology and trade secrets, and a schedule that permits supplementation of this briefing with evidence otherwise unobtainable to Analog at this stage of the case.  Analog does not suggest here that a preliminary injunction hearing within weeks is necessary – rather, it seeks a short discovery period, followed by a hearing on the merits.

The urgency of Analog's need for preliminary relief is clear.  Because customers use these amplifiers

---

[1]      On July 22, 2014, Analog Devices, Inc. acquired Hittite Microwave Corporation, which currently operates as Hittite Microwave LLC – a wholly-owned subsidiary of Analog Devices, Inc.  The two entities will be referred to jointly as "Analog" unless separation is necessary for clarity.  Similarly, MACOM Technology Solutions Holdings, Inc. and its subsidiary MACOM Technology Solutions Inc., both Defendants here, will be referred to jointly as "MACOM."

in laboratory testing instrumentation, telecom infrastructure electronics, fiber optic systems electronics, and military and space applications, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ A hearing in November (or sooner) will give the parties time to develop their record and receive the Court's decision before Analog loses additional customers.  Given the evidence that the accused products infringe Analog's U.S. Patent No. 9,425,752 (the "'752 Patent") and use its trade secrets, expedited relief is appropriate.

## II.   BACKGROUND / STATEMENT OF RELEVANT FACTS

### A.   The '752 Patented Invention, and Analog's HMC998 Amplifier

Analog's HMC998 amplifier was developed by engineers at Hittite Microwave Corporation working under the supervision of Mr. Frank Traut.  In or around 2008/2009, Mr. Traut was Hittite's Director of Integrated Circuit ("IC") Engineering.  His role included supervising the research and development work performed by many of Hittite's product design engineers, and meeting regularly with Hittite's customers to understand their requests, needs, and product requirements.  Mr. Traut also helped the company set strategy for product development, and was an active member of the Hittite patent review committee.  It was under Mr. Traut's supervision that Hittite's line of monolithic microwave integrated circuit ("MMIC") wideband distributed amplifiers was developed.  Benson Decl. ¶¶ 5-6.[2]

---

[2]     Analog's motion is supported by the expert declaration of Dr. Mark N. Horenstein ("Horenstein Decl."), and the declaration of Keith Benson, Analog's Product Line Director of RF/MW Amplifier & Phased Array IC Products ("Benson Decl.").  Citations to Exhibits ("Ex.") herein refer to the documents identified in the declaration of Kimberly A. Mottley, also filed herewith.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████        *Id.* at ¶ 7.

In this new development effort, Mr. Keith Benson, a Hittite electrical engineer working on Mr. Traut's team, innovated a unique MMIC amplifier design that had a wide band of frequency operation and increased output power, while avoiding breakdown of the amplifier due to the increased voltage required of such increased power output.  The newly designed product was branded by Hittite as the HMC998 power amplifier; the amplifier operated over a wide band of frequencies (0 to 22 GHz) and boasted 2 Watt power output specifications.  Indeed, before his invention, no GaAs amplifier product of this nature could obtain a 2 Watt power output.  *Id.* at ¶¶ 13.  Hittite patented some of Mr. Benson's innovations in developing the HMC998 amplifier.  One of the patents that covers certain of these innovations is the '752 Patent at issue in this motion.  *Id.* at ¶¶ 8-9.

In addition to its patent filings, Hittite chose to keep some of Mr. Benson's innovations as confidential trade secrets.  ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

3

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*Id.* at ¶¶ 10-12, 16.

Importantly, from his work in supervising development of the HMC998 amplifier, Mr. Traut was well aware of these design innovations that Analog kept as internal trade secrets, including the fact that Mr. Benson tried other initial designs that failed to achieve the same results. *Id.* at ¶ 14.

Hittite launched the HMC998 amplifier in November 2011. █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* at ¶¶ 13, 17-18.

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ *Id.* at ¶¶ 18-19. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████ ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ ▌ *Id.* at ¶¶ 15, 20-21.

## B.     Frank Traut's Move to MACOM

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

– Mr. Traut left Hittite (which had recently been acquired by Analog) for MACOM, where he is presently employed as MACOM's Senior Director of Technology and Innovation.  *Id.* at ¶¶ 21-23; Ex. A at 1.

Mr. Traut was then, and is still, bound by confidentiality obligations covering the trade secrets described above, including obligations enumerated in Hittite's Proprietary Information, Confidentiality and Inventions Agreement which he executed in March 2003, and Analog's Employee Confidentiality and Developments Agreement which he executed in September 2014. Ex. B at para. 1; Ex. C at 4, para. 1.  Despite his agreement to protect Analog's confidential information, however, before his departure, Mr. Traut downloaded to removable devices ███████████████ of documents containing confidential and proprietary information from Hittite and Analog systems, including highly sensitive documents related to product design, development, and market strategy.  Ex. D.

When Analog learned about Mr. Traut's unauthorized download of its proprietary information, Analog sent Mr. Traut a letter on March 13, 2015, reminding him of his confidentiality obligations.  Analog copied John Croteau, MACOM's CEO, on that letter, and then sent a second letter on March 18, 2015 directly to Mr. Croteau, requesting MACOM's assistance

---

[3]     Analog focuses on these exemplary trade secrets that concern Mr. Traut for the sole purpose of presenting its argument in this brief.  Analog reserves all rights to pursue its case – including preliminary injunctive relief – concerning the other two former employees named in the complaint (Thomas Winslow and George Papamitrou), and to identify additional trade secrets during the litigation.

in ensuring that Mr. Traut did not misuse Analog's information.  Exs. C, E.  As is evident now

from examination of MACOM products, Mr. Croteau and MACOM failed to take the necessary

precautions to ensure that MACOM did not use Analog's proprietary information.

    **C.**    **MACOM's Attempt to Capitalize on Analog Trade Secrets**

On September 21, 2016, the year after Mr. Traut left Analog for MACOM, MACOM

released its MAAP-011247 amplifier.  Ex. F.  The MAAP-011247 amplifier directly infringes

Analog's '752 Patent, and uses Analog's trade secret design choices.  Horenstein Decl. ¶¶ 22-25.



Use of the Analog trade secret design choices described above are shown in the annotated

photographs above.  Specifically annotated above are:

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

████████████████████████    *Id.* at ¶¶ 24, 26-28.   MACOM's MAAP-011247 amplifier also

infringes the '752 Patent, as described more fully in Section IV(A)(1) below.

████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

████████████████████    *Id.* at ¶¶ 26-28.

████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

████████████████████    *Id.* at ¶ 30.

████████████████████████████████
██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

## III.   LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish that [1] it is likely to succeed

on the merits; [2] that it is likely to suffer irreparable harm in the absence of preliminary

[injunctive] relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in

the public interest." *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1049 (Fed. Cir. 2010).  These

factors, taken individually, are not dispositive; rather, the district court must weigh and measure

each factor against the other factors and against the form and magnitude of the relief requested.

*Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).[4]

In patent cases, likelihood of success on the merits requires a two-step analysis:  "the

patentee must show that, in light of the presumptions and burdens applicable at trial, it will likely

prove that the alleged infringer infringes the asserted claims of the patent and that the patent will

likely withstand the alleged infringer's challenges to its validity."  *Abbott Labs. v. Sandoz, Inc.*,

544 F.3d 1341, 1372 (Fed. Cir. 2008) (internal citations omitted); *see also Printguard, Inc. v. Anti-*

*Marking Sys., Inc.*, 535 F. Supp. 2d 189, 196 (D. Mass. 2008).

Patents are presumed valid by statute, and the presumption applies during preliminary

injunction proceedings.  35 U.S.C. § 282; *see also Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct.

2238, 2242 (2011); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377, 1379-80

(Fed. Cir. 2009).  Thus, "when analyzing the likelihood of success factor, the trial court . . . must

---

[4]     For the purposes of this case, there is no material difference between the standards for
obtaining a preliminary injunction in the First and Federal Circuits.  *See Biogen Idec MA Inc. v.
Trustees of Columbia Univ. in City of New York*, 332 F. Supp. 2d 286, 295 (D. Mass. 2004).

determine whether it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." *Id.* at 1379.

To establish likelihood of success on the merits of a claim of tortious misappropriation of trade secrets under Massachusetts law, a plaintiff must make the following showings:  "1) the information at issue [] constitute[s] a trade secret, 2) the plaintiff [has] taken reasonable steps to secure the confidentiality of the trade secret, and 3) the defendant [has] used improper means to obtain the trade secret." *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011).  With respect to the third element, "a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." *Id.* (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 507 (D. Mass. 1992)).

As for irreparable harm, in the First Circuit, "the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). "[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *Biogen Idec*, 332 F. Supp. 2d at 295 (citing *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *see also Spruce Envt'l Techs., Inc. v. Festa Radon Techs., Co.*, No. 15-11521, 2015 U.S. Dist. LEXIS 86552, *10-11 (D. Mass. July 2, 2015) (finding irreparable harm based in part on the parties' positions as direct competitors).

## IV.    ARGUMENT

Prior to trial in this action, the Court should enter a preliminary injunction prohibiting MACOM from marketing and/or selling the MAAP-011247 amplifier, and from developing other related products.  All four factors favor this targeted preliminary injunctive relief.

### A.      Analog is Likely to Succeed on the Merits

### 1.      MACOM's MAAP-011247 Amplifier Infringes the '752 Patent

With respect to likelihood of success on infringement, Analog need only show that it likely will be able to prove at trial, by a preponderance of evidence, that the MAAP-011247 amplifier infringes one claim of the '752 Patent.  *Abbott Labs. v. Sandoz*, 544 F.3d at 1372; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011) (infringement occurs where an accused product meets every limitation in the asserted claim).  As explained below, and supported by the Declaration of Dr. Mark N. Horenstein filed herewith,[5] the MAAP-011247 amplifier includes each limitation of at least claims 15, 16, and 17, of the '752 Patent, and therefore infringes the patent.[6]

By way of example, claim 15 of the '752 Patent recites:

A distributed amplifier comprising:

   an *input transmission line*;

   an *output transmission line*; and

   a *plurality of cascode amplifiers* each coupled between the input transmission line and the output transmission line, wherein a first cascode amplifier of the plurality of cascode amplifiers comprises:

      *three or more field effect transistors (FETs) arranged in a stack*, wherein the three or more FETs comprises a first FET, a second FET, and a third FET, wherein the first FET includes

---

[5]      Dr. Horenstein is a professor of electrical engineering at Boston University, with over 40 years of experience in power systems and electronic circuit design.  He studied at the Electric Power Systems Engineering Laboratory at the Massachusetts Institute of Technology, where he obtained a Ph.D. in Electrical Engineering in 1978.  Horenstein Decl. ¶¶ 1, 4, 7.

[6]      Analog discusses these particular claims here for the sole purpose of presenting its preliminary injunction motion; Analog reserves all rights to assert additional patents and patent claims during the litigation.

a gate coupled to the input transmission line, wherein the second FET is positioned between the first FET and the third FET in the stack, and wherein the third FET includes a drain coupled to the output transmission line; and

*a first stabilization circuit* coupled to a gate of the third FET, wherein the first stabilization circuit comprises a first resistor and a first capacitor electrically connected in series,

*wherein the first FET is configured to generate an amplified signal* by amplifying an input signal received at the gate of the first FET from the input transmission line, wherein the first FET is further configured to provide the amplified signal to the output transmission line through the second FET, from a source of the second FET to a drain of the second FET, and through the third FET, from a source of the third FET to the drain of the third FET.

Ex. G, claim 15 (emphasis added).

A photograph of the circuitry of the MAAP-011247 amplifier is below, with annotations showing the locations of the claimed "input transmission line," "output transmission line," as well as examples of the claimed "plurality of cascode amplifiers" and "stabilization circuit." Horenstein Decl. ¶ 23. Examples of the first, second, and third field effect transistors arranged in a stack are also annotated in the photograph as #1, #2 and #3 respectively. *Id.*



The first FET is configured to generate and provide an amplified signal, as recited in the claims. *Id.*

MACOM infringes the '752 Patent, and Analog will likely prevail on this issue at trial.

**2.      The '752 Patent is Likely to Withstand Validity Challenges**

While Analog does not yet know the defenses that MACOM may raise in this case, accused infringers typically challenge the validity of an asserted patent.  However, patents are presumed valid by statute, and the presumption of validity applies during preliminary injunction proceedings. 35 U.S.C. § 282; *Titan Tire Corp.*, 566 F.3d at 1379-80.  As such, here MACOM would need to show that it is more likely than not to prove at trial, by *clear and convincing* evidence, that the Patent Office erred in granting the '752 Patent.

MACOM will be unable to make such a showing because through multiple rounds of examination, including consideration of well over 30 references cited during examination, not once did the Patent Office cite prior art that would anticipate the '752 Patent claims under 35 U.S.C. § 102.  *See* Exs. H at 3-4, I at 3-5, & J at 3-5 (rejecting initial claims under double-patenting and obviousness grounds only).  And, although the Patent Office rejected the initially-filed claims based on combinations of prior art that it asserted would render those claims obvious under 35 U.S.C. § 103, the Patent Office ultimately granted the claims after the applicant amended the claims – finding that even the "closest prior art of record" did not disclose all elements of the claims once amended.  Ex. K at 5.

Beyond the lack of compelling prior art, *objective* evidence of non-obviousness (sometimes referred to as "secondary considerations"), when presented, may often be the most probative evidence of non-obviousness.  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc*., 699 F.3d 1340, 1349 (Fed. Cir. 2012).  That objective evidence is compelling here.

For example, the patented inventions allowed Analog to introduce higher power output in GaAs wideband amplifiers, thus solving a long felt but unmet need.  Benson Decl. ¶ 7, 15.  These

amplifiers are used in laboratory testing instrumentation, telecom infrastructure applications, and fiber optic applications, among others, and major customers in the industry were demanding higher power in these amplifiers with a wide band of frequency operation. *Id.* at ¶ 7, 15.  However, higher power would require higher voltage that would inevitably destroy the transistors used in prior art power amplifiers.  The solution to this problem was not obvious – it took one of Analog's most senior and skilled engineers approximately three years to solve this problem through the inventions described in the '752 Patent. *Id.* at ¶ 8-9, 16.

And, Analog's HMC998 and HMC998A amplifiers became unmistakable commercial successes, demanded by large players in the industry such as ████████████████████ ████████████████████   *Id.* at ¶ 13, 15.

Finally, and perhaps the most compelling objective evidence, is that the invention was copied by Analog's competitor MACOM, leading to this lawsuit.

The presumption – and inescapable conclusion based on the evidence – is that Analog's '752 Patent is valid and likely will withstand any validity challenge that MACOM may assert.

### 3.  Analog Is Likely to Succeed in Proving Trade Secret Misappropriation

#### a.  Analog's Design Choices and Customer Needs are Trade Secrets

Under Massachusetts common law, "a trade secret is a 1) secret, that is 2) used in one's business, and that 3) gives the owner an opportunity to obtain an advantage over competitors who do not know or use the secret." *Optos*, 777 F. Supp. 2d at 238 (citing *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970)).  The Massachusetts statutory definition of a trade secret encompasses "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design,

process, procedure, formula, invention or improvement."  Mass. Gen. Laws ch. 93, § 42; Mass. Gen. Laws ch. 266, § 30.

The two confidential design attributes of Analog's HMC998 amplifiers, and the details concerning Analog's customers' needs for such products ████████████████████ were trade secrets, both of a technical and a business nature.  The technical trade secrets are technical designs that were kept confidential at Analog, and helped Analog's products to function to meet customer needs.  Similarly, the needs of the specific customers for the HMC998/998A amplifiers, the timing of those needs ███████████████ were secret business management information not known outside Analog.  *See Salomon Smith Barney, Inc. v. Barcomb*, No. 02-J-692, 2003 Mass. App. LEXIS 1497, at *4 (Mass. App. Ct. Jan. 3, 2003) ("the list of plaintiff's clients and the financial data and personal information relating to them, is confidential information entitled to be protected"); *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963, 972-73 (D. Mass. 1981) (finding that customer lists are protectable property); *In re Yankee Milk, Inc.*, 372 Mass. 353, 363 n.9 (1977) (finding that customer lists can constitute trade secret information).

> **b.**     **Analog Took Reasonable Steps to Protect the Confidentiality of its Trade Secrets**

In determining whether something qualifies as a trade secret, the Court needs to determine whether the trade secret owner took reasonable steps to preserve the confidentiality.  In doing so, the Court must consider:  "1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable."  *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004).  "[T]he standard is reasonableness, not perfection."  *Id.* at 30.

The existence of non-disclosure agreements or similar obligations restricting access to confidential information – such as those Mr. Traut was required to execute as part of his employment – constitute a reasonable effort to maintain the confidentiality of a trade secret. *See E. Marble Prods. Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 840 (1977) (finding that requiring employees to sign non-disclosure agreements and putting employees on notice that trade secrets were involved was sufficient); *cf. Stone Legal Res. Grp., Inc. v. Glebus*, No. 02-5136, 2002 Mass. Super. LEXIS 555, at *11 (Mass. Super. Ct. Dec. 17, 2002) (finding that informing employees about confidentiality provisions and requiring non-disclosure agreements were reasonable measures). *See also Whipps, Inc. v. Ross Valve Mfg. Co.*, No. 14-40045-TSH, 2014 WL 1874754, at *9 (D. Mass. May 8, 2014) (finding that the head of engineering, who started as a project manager and moved up the ranks, was privy to matters important business matters unintended for public consumption and would have known the importance of maintaining the secrecy of innovative designs within the industry).

### c.    MACOM Improperly Acquired Analog's Trade Secrets

As a matter of law, "an individual who breaches contractual duties to obtain trade secrets has used improper means"[7] and "[a] party who knowingly benefits from the breacher's trade secret bounty is also liable. *Optos*, 777 F. Supp. 2d at 240 (citing *Curtiss–Wright Corp. v. Edel–Brown Tool & Die Co.*, 381 Mass. 1, 5-6 (1980)). Massachusetts trade secret law attributes liability to any third party who "knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff." *Data Gen. Corp.*, 795 F. Supp. at 507 (D. Mass. 1992).[8]

---

[7]    Violation of an employment agreement has consistently been found to constitute an act of misappropriation. *See Boston Sci. Corp. v. Lee*, No. 13-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014) (finding that retention, even if inadvertent, of documents belonging to a former employer and in violation of an employment agreement constituted improper means).

[8]    Other courts have enjoined employers who have benefited from recently hired employees' disclosure of their former employer's trade secrets. *See, e.g.*, *Garvin GuyButler Corp. v. Cowen*

MACOM's acquisition of Analog's trade secret information from Mr. Traut – in violation of his contractual confidentiality obligations – constitutes improper means and thus misappropriation. MACOM cannot credibly claim ignorance that the information Mr. Traut brought to MACOM included Analog trade secrets when MACOM's CEO was twice warned in writing of that very possibility. And, it makes no difference whether the misappropriation involved Mr. Traut's use of actual documents downloaded from Analog's servers, or his use of the confidential information he retained in his memory – the result is the same: misappropriation. *See Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972) ("the fact that no list or paper was taken does not prevent the former employee from being enjoined if the information which he gained through his employment and retained in his memory is confidential in nature").

### 4. This Court Should Allow Limited Expedited Discovery Concerning MACOM's Trade Secret Misappropriation

In this motion, Analog has itemized exemplary trade secret information concerning product design and customer needs with respect to sales of the MAAP-011247 amplifier. However, the extent of MACOM's use of Analog's trade secrets is not known, and cannot be known, without further discovery. Expedited, targeted discovery would help to uncover the extent to which MACOM made use of Analog's trade secrets, as well as whether such information is being used in current design and development of other MMIC amplifier products. Thus, Analog has filed simultaneously herewith a motion for expedited discovery and supplemental briefing after that discovery is complete, such that the Court can decide the present motion on a more fulsome record.

### B. Analog Will Suffer Irreparable Harm If MACOM Is Allowed to Make Additional Sales of the MAAP-011247 Amplifier Before Trial

---

& Co., 588 N.Y.S.2d 56, 60 (Sup. Ct. 1992); *Witkop & Holmes Co. v. Great Atl. & Pac. Tea Co.*, 124 N.Y.S. 956, 958 (Sup. Ct. 1910).

Having made a strong showing of likelihood of success on the merits above, a weaker showing of irreparable harm would suffice here; however, the evidence supports a strong showing of irreparable harm as well. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

First, when a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed. *Optos*, 777 F. Supp. 2d at 241 (citing *EchoMail, Inc. v. Am. Express Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005)). "Injunctive relief is warranted to prevent misappropriation and unlawful use of confidential records such as the customers' names and addresses in circumstances in which the former employee and employer entered into a contract that restricts the former employee's use of such material following his employment." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey*, 18 Mass. L. Rptr. 49, at *4-5 (Mass. Super. Ct. 2004). Withholding injunctive relief in a situation where a departing employee may take a competitive position with another in the same market as the plaintiff would cause irreparable harm that cannot be quantified or remedied with money damages. *See Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008); *see also Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827 (D. Mass 1990) (finding loss of good

will due to unknown or future violations of non-compete agreements to be irreparable).

While irreparable harm is not presumed in patent cases, "[i]t is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d at 1456-57. Thus, in patent cases, while irreparable harm cannot be conclusively presumed, a finding that other remedies will suffice absent an injunction undermines the nature of a patentee's exclusionary right. The mere possibility of future monetary damages does not defeat a motion for preliminary injunction. *See Abbott Labs. v. Sandoz*, 544 F.3d at 1361-62 (holding that price erosion and loss of market position are evidence of irreparable harm, notwithstanding the award of monetary damages); *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006) (same).



### C.    The Balance of Hardships Strongly Favors a Preliminary Injunction

"[T]he 'balance of hardships' assesses the relative effect of granting or denying an injunction on the parties . . . ."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).  Relevant considerations include the duration of the injunction, and "the parties' sizes, products, and revenue sources."  *Id.* at 863.  Because monetary damages are unlikely to compensate for the disclosure of trade secrets to third parties, such damages caused by disclosure to the industry tip the balance of harms in favor of the trade secret plaintiff.  *TouchPoint Sols.*, 345 F. Supp. 2d at 32.  Here, Analog is seeking targeted injunctive relief which would not unduly burden MACOM, in view of the nature of the harm to Analog if MACOM were not so enjoined for another two years.

---

9    *See Trebro Mfg.,* 748 F.3d at 1171 (granting injunctive relief where parties were "direct competitors selling competing products," which "strongly shows a probability for irreparable harm," even when the plaintiff-patentee did not presently practice the patent); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) ("the existence of a two-player market may well serve as a substantial ground for *granting* an injunction" because "it creates an inference that an infringing sale amounts to a lost sale for the patentee"); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (granting preliminary injunction where patentee's "flagship products" were "in their growth phase and [would] soon be entering the mature phase with the highest revenues and strongest market position").

**D.     The Public Interest Strongly Favors a Preliminary Injunction**

"[I]t is generally in the public interest to uphold patent rights . . . ."  *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008).[10]  The Federal Circuit has long held that sound public policy "acknowledge[s] the importance of the patent system in encouraging innovation." *Sanofi–Synthelabo*, 470 F.3d at 1383.  There is no reason to depart from that general rule here.

Similarly, "Massachusetts has a clear public policy in favor of strong protections for trade secrets."  *Optos*, 777 F. Supp. at 242; *Jet Spray Cooler*, 377 Mass. at 166 n.8.  "If an employer designs a machine, invents a process or discovers a formula that has a special business application, the employer has a right to prevent a former employee from using that confidential information for a competitor."  *Edwards v. Athena Capital Advisors, Inc.*, No. 072418E, 2007 WL 2840360, at *3 (Mass. Super. Ct. Aug. 9, 2007).  The purpose of an injunction in a trade secret case, beyond protecting the secrecy of the misappropriated information, is to "eliminate the unfair advantage obtained by the wrongdoer and reinforce the public policy of commercial morality."  *Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 778 (D. Mass. 1994).  The public has "a manifest interest not only in commercial innovation and development, but also in '[t]he maintenance of standards of commercial ethics.'"  *Jet Spray Cooler*, 377 Mass. at 166-67 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974)).  The public interest factor in protecting Analog's patent and trade secret rights, thus, weighs in favor of an injunction.

**V.     CONCLUSION**

For the foregoing reasons, the Court should issue a preliminary injunction order enjoining any further marketing of sale of the MAAP-011247 amplifier pending trial in this case.

---

[10]     *See also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) ("[C]ourts have in *rare* instances exercised their discretion to deny injunctive relief to protect the public interest.") (emphasis added).

Dated:  June 29, 2018

Respectfully submitted,

**ANALOG DEVICES, INC. and
HITTITE MICROWAVE LLC**

By their attorneys,


*/s/ Steven M. Bauer*
Steven M. Bauer (BBO No. 542531)
Kimberly A. Mottley (BBO No. 651190)
Safraz W. Ishmael (BBO No. 657881)
Kimberly Q. Li (BBO No. 698488)
**PROSKAUER ROSE LLP**
One International Place
Boston, Massachusetts 02110-2600
(617) 526-9600 *telephone*
(617) 526-9899 *facsimile*
sbauer@proskauer.com
kmottley@proskauer.com
sishmael@proskauer.com
kli@proskauer.com

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing on June 29, 2018.


*/s/ Steven M. Bauer*
Steven M. Bauer